Slip Op. 25-52

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **KUMAR INDUSTRIES,** | |
| **Plaintiff,** | |
| **v.** | **Before:  Judge Gary S. Katzmann** |
| **UNITED STATES,** | **Court No. 23-00263** |
| **Defendant.** | |

## OPINION

[ Plaintiff's Motion for Judgment on the Agency Record is denied. ]

Dated: <u>April 23, 2025</u>

<u>David J. Craven</u>, Craven Trade Law LLC, of Chicago, Ill., argued for Plaintiff Kumar Industries.

<u>Kelly M. Geddes</u>, Trial Attorney, U.S. Department of Justice, Washington, D.C., argued for Defendant United States.  With her on the briefs were <u>Brian M. Boynton</u>, Principal Deputy Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, <u>Claudia Burke</u>, Deputy Director.  Of Counsel on the briefs were <u>Jack Dunkelman</u> and <u>Joseph Grossman-Trawick</u>, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

Katzmann, Judge:  This case involves a company's claims of non-affiliation during the U.S.

Department of Commerce's ("Commerce") 2021–22 administrative review of the antidumping

order on imports of glycine[1] from the People's Republic of China, India, and Japan and

---

[1] Glycine is a nonessential amino acid that is produced naturally by humans and other organisms as a building block for proteins.  <u>See</u> Glycine from China, India, and Japan at 7, Inv. Nos. 701-TA-603-604, 731-TA-1413-1414 (Final), USITC Pub. 4900 (June 2019).  Glycine is commercially produced at various purity grades for a wide variety of uses.  <u>Id.</u>  For example, United States Pharmacopeial Convention–grade glycine is used as a sweetener and flavor enhancer in food, beverages, and pharmaceuticals, while technical-grade glycine is used for most industrial applications.  Some applications, such as semiconductor manufacturing, require higher-purity glycine.  <u>Id.</u>

Commerce's subsequent use of an adverse inference in selecting among facts otherwise available to determine that company's dumping margin.  See Glycine from India: Final Results of Antidumping Duty Administrative Review; 2021-2022, 88 Fed. Reg. 77552 (Dep't Com. Nov. 13, 2023) ("Final Results").   In the 2021–22 administrative review, Commerce selected Kumar Industries ("Kumar"), a producer and exporter of glycine from India, as a mandatory respondent to be individually investigated and requested information about its affiliates.  See Respondent Selection Mem. (Sept. 22, 2022), P.R. 18, C.R. 3; Letter from B. Davis to A. Bhargava, re: Initial Questionnaire (Dep't Com. Sept. 22, 2022), P.R. 19 ("Initial Questionnaire").  Commerce had found evidence in prior administrative reviews indicating that Kumar was affiliated with two companies (hereafter "Companies A and B").[2]  See Mem. from J. Maeder to R. Majerus, re: Issues and Decision Memorandum for Final Results of Antidumping Duty Admin. Rev.; 2018–2020 at 28–32, Case No. A-533-883, Bar Code: 4179288-02 (Dep't Com. Nov. 4, 2021) ("2018–20 IDM"); Mem. from J. Maeder to L. Wang, re: Issues and Decision Mem. for Final Result of Antidumping Duty Admin. Rev.; 2020-2021 at 5–6, Case No. A-533-883, Bar Code: 4308456-02 (Dep't Com. Nov. 4, 2022) ("2020–21 IDM").  As a result, when Kumar did not list Companies A and B as affiliates during the 2021–22 administrative review, see Letter from SBA Strategy Consulting LLP to G. Raimondo, re: Submission of Section-A Initial Questionnaire Resp. at 7 (Oct. 20, 2022), P.R. 32, C.R. 10 ("Initial Questionnaire Resp."), Commerce issued two supplemental questionnaires asking specifically about Kumar's affiliation with Companies A and B, see Letter from B. Davis to A. Bhargava, re: First Suppl. Questionnaire (Dep't Com. Nov. 22, 2022), P.R. 67, C.R. 73 ("First Suppl. Questionnaire"); Letter from B. Davis to A. Bhargava, re: Second Suppl. Questionnaire (Dep't Com. Feb. 3, 2023), P.R. 125 ("Second Suppl. Questionnaire").  Kumar maintained that the

---

[2] The names of these two companies appear in Kumar's confidential brief.  See Pl.'s Br. at 8.

companies were not affiliated with Kumar during the period of review.  See Letter from A. Bhargava to G. Raimondo, re: Submission of Kumar's First Supplemental Questionnaire Response at 6 (Dec. 12, 2022), P.R. 75, C.R. 76 ("First Suppl. Questionnaire Resp."); Letter from SBA Strategy to G. Raimondo, re: Submission of Kumar's Second Suppl. Questionnaire Resp. at 2–3 (Feb. 15, 2023), P.R. 133, C.R. 108 ("Second Suppl. Questionnaire Resp.").

Commerce issued its final determination on November 13, 2023.  See Final Results, 88 Fed. Reg. 77552.  In an accompanying memorandum, Commerce explained that necessary information was not available on the record, and that Kumar had withheld requested information, failed to provide information by the specified deadlines, and significantly impeded the proceeding by failing to provide information and documents substantiating its claim of non-affiliation with Companies A and B.  See Mem. from J. Maeder to A. Elouaradi, re: Issues and Decision Mem. for Final Results of Antidumping Duty Admin. Review at 12–14 (Dep't Com. Nov. 6, 2023), P.R. 205 ("IDM").  Commerce also found that Kumar did not act to the best of its ability in responding to questions about affiliation.  See id. at 14–18.  As a result, Commerce applied the highest calculated individual margin for Kumar.  See IDM at 22.  Kumar now brings this action against Defendant the United States ("the Government"), challenging the final results of the 2021–22 administrative review.  See Am. Compl. ¶ 1, Jan. 1, 2024, ECF No. 8; Summons, Dec. 7, 2023, ECF No. 1.

This case presents two issues: (1) Whether Commerce's application of an adverse inference to Kumar is supported by substantial evidence and is otherwise in accordance with law; and (2) whether Commerce's decision to subtract antidumping and countervailing duties from the U.S. duties for only three of Kumar's transactions is supported by substantial evidence and otherwise in accordance with law.  The court concludes that Commerce's application of an adverse inference and subtraction of antidumping and countervailing duties for only three transactions is supported

by substantial evidence and otherwise in accordance with law.  Therefore, the court denies Kumar's motion.

## LEGAL BACKGROUND

The court briefly summarizes relevant concepts of trade law below before diving into the issues in this case.

### I.      Antidumping Duties

"Dumping" occurs when a foreign producer sells goods in the United States at a lower price than the producer charges for the same product in its home market.  See Sioux Honey Ass'n v. Hartford Fire Ins. Co., 672 F.3d 1041, 1046 (Fed. Cir. 2012).  "Sales at less than fair value are those sales for which the 'normal value' (the price a producer charges in the home market) exceeds the 'export price' (the price of the product in the United States)."  See Apex Frozen Foods v. United States, 862 F.3d 1322, 1326 (Fed. Cir. 2017) (citation omitted); see also 19 U.S.C. § 1677(35)(A).[3] This practice constitutes unfair competition because it permits foreign producers to undercut domestic producers by selling products below "fair value."  See Apex Frozen Foods, 862 F.3d at 1326.  To address the harmful impact of such unfair competition, Congress enacted the Tariff Act of 1930 (codified as amended at 19 U.S.C. §§ 1202 to 1683g), which empowers Commerce to investigate potential dumping and, if necessary, to issue orders instituting duties on subject merchandise.  See id.  Pursuant to 19 U.S.C. § 1673, Commerce imposes antidumping duties on imported goods if it determines that the goods are being, or are likely to be, sold at less than fair

---

[3] Congress has defined "normal value" as "the price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade."  19 U.S.C. § 1677b(a)(1)(B)(i).  The "export price" is "the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States, as adjusted . . . ."  Id. § 1677a(a).

value and the International Trade Commission determines that the sale of the merchandise at less than fair value materially injures, threatens, or impedes the establishment of an industry in the United States.  See also Diamond Sawblades Mfrs. Coal. v. United States, 866 F.3d 1304, 1306 (Fed. Cir. 2017); Shandong Rongxin Imp. & Exp. Co. v. United States, 42 CIT __, __, 331 F. Supp. 3d 1390, 1394 (2018).  Where dumping occurs, federal law authorizes Commerce to impose an "antidumping duty" in an amount that reflects the difference between the "normal value" in the home market and the "export price" (or the constructed export price) of selling the product in the United States.  19 U.S.C. § 1673; see also Shandong Rongxin, 331 F. Supp. 3d at 1394.

Upon a party's request, Commerce must "review[] and determine . . . the amount of any antidumping duty" each year after the publication of an antidumping duty order.  Id. § 1675(a)(1)(B).  In conducting this administrative review, Commerce is to determine anew "the normal value and export price (or constructed export price) of each entry of the subject merchandise, and . . . the dumping margin for each entry."  Id. § 1675(a)(2)(A).

## II.    Calculating Antidumping Duties

As the normal value and export price may each rest on aggregated data (sets of multiple sales at different prices), Commerce determines the difference between the two values by calculating a weighted-average dumping margin.  See 19 U.S.C. § 1677f-1(c)(1); 19 C.F.R. § 351.414(b)(1).  Commerce generally "determine[s] the individual weighted average dumping margin for each known exporter and producer of the subject merchandise."  19 U.S.C. § 1677f-1(c)(1).  In cases where "[i]t is not practicable to make individual weighted average dumping margin determinations"—like where there are a "large number of exporters or producers involved in the investigation or review"—Commerce "may determine the weighted average dumping margins for a reasonable number of exporters or producers."  Id. § 1677f-1(c)(2).  Commerce may thus limit its examination to "a sample of exporters, producers, or types of

products," or to "exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that can be reasonably examined." Id. The respondents Commerce includes in this "reasonable number" of exporters are the mandatory respondents for the investigation or review. Id.

### III.    *Party Submissions*

In antidumping proceedings, Commerce "obtains most of its factual information . . . from submissions made by interested parties during the course of the proceeding." 19 C.F.R. § 351.301(a); see also QVD Food Co. v. United States, 658 F.3d 1318, 1324 (Fed. Cir. 2011) ("Although Commerce has authority to place documents in the administrative record that it deems relevant, the burden of creating an adequate record lies with interested parties and not with Commerce.") (internal quotation marks and citation omitted). Under 19 U.S.C. § 1677e(a), Commerce relies on facts otherwise available to reach the applicable determination if

> necessary information is not available on the record, or . . . an interested party or any other person—(A) withholds information that has been requested by [Commerce] under this subtitle, (B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to [19 U.S.C. § 1677m(c)(1) and (e)], (C) significantly impedes a proceeding under this subtitle, or (D) provides such information but the information cannot be verified as provided in [§] 1677m(i).

19 U.S.C. § 1677e(a). If Commerce also finds that "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information," Commerce "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available." Id. § 1677e(b).

If Commerce determines that a party's response to a request for information is insufficient, it "shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency." Id. § 1677m(d). "If that person submits further information in response to such

deficiency" and Commerce "finds that the information is not satisfactory" or was "not submitted within applicable time limits," then Commerce may "disregard all or part of the original and subsequent responses." Id.

### FACTUAL BACKGROUND

On August 9, 2022, Commerce initiated an administrative review of the antidumping duty order on glycine from India during the period of June 1, 2021, to May 31, 2022, at Kumar's request. See Initiation of Antidumping and Countervailing Duty Administrative Reviews, 87 Fed. Reg. 48459, 48461 (Dep't Com. Aug. 9, 2022), P.R. 11; see also Glycine from China, India, and Japan; Determinations, 84 Fed. Reg. 29238 (ITC June 21, 2019); Glycine from India and Japan: Amended Final Affirmative Antidumping Duty Determination and Antidumping Duty Orders, 84 Fed. Reg. 29170 (Dep't Com. June 21, 2019). Commerce found that there was "a large number of exporters or producers of glycine from India covered by this administrative review," and that "it [was] not practicable to individually examine and determine an individual weighted-average dumping margin for each exporter or producer . . . ." Respondent Selection Mem. at 3. As a result, Commerce selected the two exporters or producers with the largest volume of entries of subject merchandise—Avid Organics Private Limited ("Avid") and Kumar—for individual examination as mandatory respondents. See id. at 4; 19 U.S.C. § 1677f-1(c)(1).

On September 22, 2022, Commerce issued the Initial Questionnaire to Avid and Kumar requesting various information about their production and sale of glycine including information about affiliates.[4] See Initial Questionnaire at A-3. In response, Kumar identified several affiliates

---

[4] In its Initial Questionnaire, Commerce defines "Affiliated Persons" as including:

> (1) members of a family; (2) an officer or director of an organization and that organization; (3) partners; (4) employers and employees; (5) any person directly or indirectly owning, controlling, or holding with power to vote, 5 percent or more of the outstanding voting stock or shares of any organization and that organization;

and charts purporting to list all its affiliates.  See id. at 7; Exs. to Initial Questionnaire Resp. at A-3, A-3(a), A-4 (Oct. 20, 2022), C.R. 13 ("Affiliate Charts").  Kumar did not identify Companies A or B as affiliates in its initial response.  See id.

In prior administrative reviews, Commerce had found evidence that Kumar was affiliated with Companies A and B.  See 2018–20 Final Results, 86 Fed. Reg. 62508; 2018–20 IDM at 28–32; 2020–21 Final Results, 87 Fed. Reg. 67870; 2020–21 IDM at 5–6.  Though Kumar had disclaimed any affiliation in the prior administrative reviews, Commerce found contradictory evidence among Kumar's supporting documents that suggested affiliation.  See 2018–20 IDM at 28–30; 2020–21 IDM at 5–6.  For example, during the 2018–20 administrative review, Kumar claimed, just as it did in the present administrative review, that it was not affiliated with Companies A and B.  See Letter from A. Bhargava to W. Ross, re: Submission of Section A Questionnaire Resp. at Exhibit A-3, Case No. A-533-883, Bar Code: 4042288-01 (Oct. 20, 2020) (not listing Companies A and B as affiliates); Letter from A. Bhargava to Acting Secretary of Com., re: Submission of Section A to D Suppl. Questionnaire Resp. at 6, Case No. A-533-883, Bar Code: 4092395-01 (Feb. 24, 2021)

---

(6) two or more persons directly or indirectly controlling, controlled by, or under common control with, any person; and (7) any person who controls any other person and that other person.   Control exists when a person is legally or operationally in a position to exercise restraint or direction over another person.  A control relationship should also have the potential to affect decisions concerning the production, pricing, or cost of the merchandise under investigation or review.

Examples of situations which may indicate control include (but are not limited to): (a) joint ventures and franchises; (b) lender/borrower situations; (c) a close relationship with a supplier, (sub) contractor, lender, distributor, exporter or reseller; and (d) a group of companies controlled by, for example, a family, a corporation, or the same investors.  An example of affiliation by common control may be the affiliation between the owners of a joint venture when each owner is in a control position with that joint venture.

Initial Questionnaire at I-1–2.

("2018–20 Second Suppl. Questionnaire Resp.") (denying affiliation with Companies A and B).[5]

In that administrative review, Kumar also provided supporting documentation, including

retirement deeds showing that Kumar's partners sold their shares of Companies A and B before

the period of review, see 2018–20 Second Suppl. Questionnaire Resp. at Exs. A-18 and A-18(a),

and tax returns of Kumar's partners who had previously owned shares of Companies A and B, see

Letter from A. Bhargava to G. Raimondo, re: Submission of Section A of Third Suppl.

Questionnaire Resp. from Q.1 to Q.12 at 3, Case No. A-533-883, Bar Code: 4113227-01 (Apr. 22,

2021) ("2018–20 Third Suppl. Questionnaire Resp."); see also 2018–20 IDM at 28–29 (describing

Kumar's provision of retirement deeds and tax returns).  However, Commerce found that some of

the documents Kumar provided contradicted Kumar's claim of non-affiliation.  For example, while

Kumar claimed that none of its partners received any income from Companies A or B, Kumar also

provided the tax returns of a partner showing income from Companies A and B.  See 2018–20

Third Suppl. Questionnaire Resp. at 1–2 and Ex. A-21.1; see also 2018–20 IDM at 28–29.

Commerce "found[] that this partner's receipt of income from Companies A and B undermine[d]

the credibility of the retirement deeds as evidence that the affiliation between this partner and

Companies A and B was, in fact, discontinued, because this partner's receipt of income from

Companies A and B is inconsistent with certain terms in the retirement deeds."  2018–20 IDM at

29.[6]  As a result, Commerce applied adverse inferences during these prior administrative reviews

---

[5] Kumar made similar assertions during the 2020–21 administrative review.  See 2020–21 IDM;
Letter from A. Bhargava to G. Raimondo, re: Submission of Section-A Questionnaire Resp. at 8–9,
Case No. A-533-883, Bar Code: 4161435-01 (Sept. 16, 2021) ("2020–21 Initial Questionnaire
Resp.") (claiming no affiliation with Companies A and B); Letter from A. Bhargava to G.
Raimondo, re: First Suppl. Questionnaire Resp. at 6–7, Case No. A-533-883, Bar Code:
4195215-01 (Dec. 29, 2021) (reiterating claim of no affiliation with Companies A and B).

[6] Commerce found similar inconsistencies in Kumar's supporting documentation during the
2020–21 administrative review and subsequently used an adverse inference in selecting among the
facts otherwise available.  See 2020–21 Initial Questionnaire Resp. at Exs. A-4(c) and (d) (copies

based on Kumar's lack of cooperation in providing information regarding its affiliation with Companies A and B.  See 2018–20 IDM at 28–30; 2020–21 IDM at 5–6.

Kumar again did not list Companies A and B as affiliates in its initial response during the 2021–22 administrative review and did not provide any supporting documentation to demonstrate that its affiliation status had changed since the prior administrative reviews.  See Initial Questionnaire Resp. at 7; Affiliate Charts.  As a result, Commerce issued a supplemental questionnaire on November 22, 2022, requesting that Kumar "explain in detail with supporting documents whether" Companies A and B "are affiliated with Kumar," produced glycine in India, imported glycine into India, or sold glycine.  First Suppl. Questionnaire at 5.  If Companies A and B were not affiliated with Kumar, Commerce requested that Kumar "provide supporting documents that demonstrate that these companies were not affiliated with Kumar during the [period of review]."  Id.

Kumar responded on December 12, 2022, stating that Companies A and B were not affiliated with Kumar and that Kumar "had sufficiently explained this in detail[ed] submissions during previous administrative reviews."  First Suppl. Questionnaire Resp. at 6.  Kumar also stated that Companies A and B did not produce or sell glycine during the period of review and that the "companies informed [Kumar] that they will not share their audited financials."  Id.

Commerce issued a Second Supplemental Questionnaire on February 3, 2023, again requesting that Kumar provide a narrative explanation and supporting documentation regarding its affiliation, or lack thereof, with Companies A and B during the period of review.  See Second

---

of retirement deeds submitted to demonstrate that partners resigned from partnership positions in Companies A and B); see also Mem. from Y. Chun to B. Davis, re: Prelim. Application of Adverse Facts Available to Kumar Industries at 1–2, Case No. A-533-883, Bar Code: 4260013-01 (Dep't Com. June 30, 2022) (explaining that the person who signed the relevant retirement deeds had died on the date of one retirement deed and before the date of the other).

Suppl. Questionnaire at 4.  In its request, Commerce emphasized that Kumar must provide "more substantive information than just a statement saying that Kumar is not affiliated with these companies." Id.  Commerce also reminded Kumar that it had applied adverse inferences in the previous administrative reviews when it was "unable to determine Kumar's affiliation status with these companies because Kumar failed to cooperate to the best of its ability in response to [its] multiple requests for information concerning Kumar's affiliation status with these companies." Id. In response, Kumar repeated its prior representations that it had no affiliations with Companies A and B, that Companies A and B confirmed they had not produced or sold glycine during the period of review, and that Companies A and B refused to provide audited financial statements.  See Second Suppl. Questionnaire Resp. at 2–3.  Kumar included correspondences between Kumar and Companies A and B in its second supplemental questionnaire response.  See Exs. to First. Suppl. Questionnaire Resp. at Ex. A-12.1 (Dec. 12, 2022), C.R. 86 ("Letters Between Kumar and Companies A and B").

Commerce published final results for the 2021–22 administrative review on November 13, 2023, determining that necessary information was not available on the record and that Kumar withheld requested information, failed to provide information by the specified deadlines, and significantly impeded the proceeding by failing to provide information and documents substantiating its claim of non-affiliation with Companies A and B.  See Final Results, 88 Fed. Reg. 77552; IDM at 12–14; see also 19 U.S.C. § 1677e(a).  Commerce also determined that Kumar had not cooperated to the best of its ability and subsequently applied an adverse inference to apply the highest calculated individual margin for Kumar's rate.  See IDM at 14–22.

## I.    *Procedural History*

On December 7, 2023, Kumar initiated this action "to contest the final results issued by [Commerce] in the § 751 administrative review of Glycine from India."  Am. Compl. ¶ 1, Jan. 1,

2024, ECF No. 8; see Summons, Dec. 7, 2023, ECF No. 1.  Kumar timely filed its motion for judgment on the agency record on June 3, 2024.  See Conf. Mot. for J. on the Agency R., June 3, 2024, ECF No. 21; Pub. Mot. for J. on the Agency R., June 3, 2024, ECF No. 22; Conf. Am. Mot. for J. on the Agency R., Sept. 19, 2024, ECF No. 29 ("Pl.'s Br."); Pub. Am. Mot. for J. on the Agency R., Sept. 19, 2024, ECF No. 30.

The Government filed its response on September 6, 2024, asking the court to deny the motion for judgment on the agency record.  See Conf. Resp. in Opp'n to Mot. for J. on the Agency R., Sept. 6, 2024, ECF No. 23; Pub. Resp. in Opp'n to Mot. for J. on the Agency R., Sept. 6, 2024, ECF No. 24; Conf. Am. Resp. in Opp'n to Mot. for J. on the Agency R., Sept. 11, 2024, ECF No. 26 ("Gov't Br."); Pub. Am. Resp. in Opp'n to Mot. for J. on the Agency R., Sept. 11, 2024, ECF No. 27.  Kumar filed its reply on October 7, 2024.  See Conf. Reply, Oct. 7, 2024, ECF No. 33 ("Pl.'s Reply"); Reply, Oct. 7, 2024, ECF No. 34.

The court scheduled oral argument for January 22, 2025.  See Order, Nov. 13, 2024, ECF No. 39.  The court issued questions in advance of oral argument to Kumar and the Government, see Letter re: Qs. for Oral Arg., Jan. 2, 2025, ECF No. 41, to which those parties filed written responses, see Pl.'s Resp. to Ct.'s Qs. for Oral Arg., Jan. 16, 2025, ECF No. 47 ("Pl.'s OAQ Resp."); Def.'s Resp to Ct.'s Qs. for Oral Arg., Jan. 16, 2025, ECF No. 48 ("Gov't OAQ Resp.").  Oral argument took place as scheduled.  See Notice of Oral Arg., Jan. 22, 2025, ECF No. 49.

With all filings now in hand, the court turns to the merits of the case.

### JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(A).  The standard of review in this action is set forth in 19 U.S.C. § 1516a(b)(l)(B)(i):  "The court shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance

with law." Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Broadcom Corp. v. Int'l Trade Comm'n, 28 F.4th 240, 249 (Fed. Cir. 2022) (internal quotation marks and citation omitted).

## DISCUSSION

Kumar asserts a number of errors in Commerce's final determination, suggesting that Commerce (1) incorrectly applied an adverse inference against Kumar, (2) ignored its statutory mandate to notify Kumar of the deficiency and providing an opportunity to address the issue, and (3) incorrectly deducted antidumping and countervailing duties in calculating U.S. price. The court denies Kumar's motion. See Pl.'s Br.

> *I.      Commerce's Application of an Adverse Inference Against Kumar is Supported by Substantial Evidence and is Otherwise in Accordance with Law.*

Commerce's decision to apply an adverse inference involves an analysis with "two distinct parts respectively addressing two distinct circumstances under which Commerce has received less than the full and complete facts needed to make a determination." Nippon Steel v. United States, 337 F.3d 1373, 1381 (Fed. Cir. 2003). First, where a respondent fails to provide information, Commerce fills in the gaps with "facts otherwise available." 19 U.S.C. § 1677e(a). "The mere failure of a respondent to furnish requested information—for any reason—requires Commerce to resort to other sources of information to complete the factual record on which it makes its determination." Nippon Steel, 337 F.3d at 1381. Second, recall that Commerce may "use an inference that is adverse to the interests of [a respondent] in selecting from among the facts otherwise available," only if Commerce determines that the respondent "has failed to cooperate by not acting to the best of its ability to comply." 19 U.S.C. § 1677e(b). The focus of this second part "is respondent's failure to cooperate to the best of its ability, not its failure to provide requested information." Nippon Steel, 337 F.3d at 1381 (emphasis omitted).

Kumar argues that Commerce's decision to apply an adverse inference against Kumar "was legally unsupported and did not comply with the established standards for the taking of adverse inferences." Pl.'s Br. at 9. Kumar first suggests that no necessary information was missing from the record, such that it was unnecessary to fill any gaps with facts otherwise available. See id. at 12–17. Second, Kumar argues that it complied with Commerce's requests to the best of its ability, such that it was inappropriate to apply an adverse inference. See id. at 20–22. Commerce determined (1) that necessary information was missing from the record and (2) that Kumar did not act to the best of its ability. Because each of these determinations is supported by thorough considerations of Kumar's actions during the investigation, the court concludes that Commerce's decision to apply an adverse inference against Kumar is supported by substantial evidence and in accordance with law.

### A.   Commerce's Decision to Use Facts Otherwise Available Is Supported by Substantial Evidence and in Accordance with Law.

Commerce first determined that necessary information regarding Kumar's affiliation with Companies A and B was missing from the record and subsequently applied facts otherwise available to calculate Kumar's rate. See IDM at 12. Recall that under 19 U.S.C. § 1677e(a), Commerce shall use "facts otherwise available" if necessary information is not available on the record or if an interested party (1) withholds information that Commerce requested, (2) fails to provide information by the deadline, (3) significantly impedes a proceeding, or (4) provides information that cannot be verified.

The Government argues that Commerce made two reasonable findings: First, that Kumar failed to provide information regarding Kumar's affiliation with Companies A and B and that this information was necessary for the calculation of the normal value and dumping margin calculation. See Gov't Br. at 9–10; Gov't OAQ Resp. at 6–7. Second, that Kumar withheld information that

Commerce requested, failed to provide information by the deadline Commerce set, significantly impeded the proceeding, and provided information that Commerce could not verify.  <u>See</u> Gov't Br. at 8–10.  Kumar counters that it provided all the information necessary to conclude that it was not affiliated with Companies A and B, and that Commerce's findings are therefore unsupported by substantial evidence and not in accordance with law.  <u>See</u> Pl.'s Br. at 12–15.  Kumar also suggests that Commerce erroneously focused only on the absence of a single audited financial statement rather than the record as a whole.  <u>See</u> <u>id.</u> at 15.

As Commerce pointed out in its IDM, information about affiliation is "fundamental" for Commerce to calculate the dumping margin.  <u>See</u> IDM at 14.  For example, "[i]f an importer or producer sold the foreign like product through an affiliated party, [Commerce] may calculate normal value based on such sale by the affiliated party."  19 C.F.R. § 351.403(c).  Additionally, "[i]n some instances, Commerce will treat related entities as a single entity for purposes of [price adjustment] calculations."  <u>Prosperity Tieh Enter. Co. v. United States</u>, 965 F.3d 1320, 1323 (Fed. Cir. 2020) (citation omitted).  "The purpose of collapsing multiple entities into a single entity is to prevent affiliated entities from circumventing antidumping duties by 'channeling production of subject merchandise through the affiliate with the lowest potential dumping margin.' "  <u>Prosperity Tieh</u>, 965 F.3d at 1323 (alterations omitted) (quoting <u>Slater Steels Corp. v. United States</u>, 27 CIT 1255, 1261, 279 F. Supp. 2d 1370, 1376 (2003)).  Here, Commerce noted that "the administrative record lacks information concerning whether: (1) Kumar is affiliated with Companies A and B; [and] (2) [whether] Companies A and B made sales of glycine in the comparison market."  IDM at 13–14.  Kumar reported that its home market was not viable for purposes of calculating normal value.  <u>See</u> Initial Questionnaire Resp. at 2–4.  However, without information about Kumar's affiliation with Companies A and B, Commerce was unable to determine whether Companies A

and B sold glycine in the home market and, consequently, whether they had viable home markets for purposes of calculating normal value. See IDM at 13–14. Additionally, without information regarding affiliation, Commerce was not able to determine whether Kumar and Companies A and B should be treated as a single entity to calculate the dumping margin. See id. Therefore, Commerce's conclusion that necessary information was missing from the record is supported by substantial evidence and in accordance with law.

As summarized above, Commerce initially asked Kumar about its affiliates generally, see Initial Questionnaire at A-3, and later asked specifically about Kumar's affiliation with Companies A and B, see First Suppl. Questionnaire at 5; Second Suppl. Questionnaire at 4. In response, Kumar repeatedly claimed that it had no affiliations with Companies A and B. See Initial Questionnaire Resp. at 7; First Suppl. Questionnaire Resp. at 6; Second Suppl. Questionnaire Resp. at 2–3. Commerce noted that "a statement saying that Kumar is not affiliated with these companies," would not be enough and requested "a narrative explanation and supporting documentation," for their claim of non-affiliation. Second Suppl. Questionnaire at 4. Kumar responded that it had already "clarified that it has no affiliation with [Companies A and B] . . . ." Id. at 2. Though Kumar indicated that Companies A and B "clearly stated in their written responses that they have no affiliation with Kumar," Pl.'s Br. at 14 (citing Letters Between Kumar and Companies A and B), these statements are, like Kumar's own statements, unsupported assertions prepared for the purpose of the administrative review. Kumar's failure to substantiate its claims of non-affiliation deprived Commerce of information that was fundamental to calculate the dumping margin. Without this information, Commerce reasonably resorted to facts otherwise available to calculate the normal value and antidumping duties in this administrative review.

Kumar claims it sufficiently demonstrated that it was not affiliated with Companies A and

B by providing "detailed charts and supporting information . . . for all of the affiliated parties detailing the nature of the relationships, activities, ownership[,] and control." Pl.'s Br. at 13. In response to Commerce's multiple requests for information regarding Kumar's affiliation with Companies A and B, Kumar provided a statement that it was not affiliated with Companies A and B, charts purporting to list its affiliates that do not include Companies A and B, and a series of letters between Kumar and Companies A and B in which the Companies claim they are not affiliated with Kumar. See Initial Questionnaire Resp. at 7; Affiliate Charts; Letters Between Kumar and Companies A and B. However, the court concludes that these documents do not provide more than unsubstantiated claims of non-affiliation and therefore do not meet Commerce's request for "[s]upporting documents [that] contain more substantive information than just a statement saying that Kumar is not affiliated with these companies." Second Suppl. Questionnaire at 4. Kumar created the charts of its affiliates itself and provided no substantiating documentation to support the information in the charts. See Affiliate Charts. Therefore, the charts do not provide more than additional unsubstantiated claims of non-affiliation. Commerce reasonably concluded that the correspondences between Kumar and Companies A and B also fail to provide any substantive information beyond mere claims of non-affiliation. See IDM at 13; Letters Between Kumar and Companies A and B. Kumar argues that Companies A and B's "refusal to disclose this [their audited financials] . . . is conclusive evidence that neither company is affiliated with Kumar." Pl.'s Br. at 14. However, if Companies A and B were affiliated with Kumar, as Commerce reasonably suspected based on prior reviews, their statements regarding affiliation and their refusal to provide supporting documentation would be tantamount to Kumar's own unsupported statements of non-affiliation. Thus, without more information supporting the content in the letters, they also contain nothing more than unsubstantiated claims of non-affiliation. Kumar goes so far

as to suggest that the "fact that these assertions were not corroborated, is in fact, corroboration" because "there was no logical reason for Kumar to not answer these questions if it were able to do so." Pl.'s OAQ Resp. at 4–5. However, the mere lack of corroboration cannot possibly substantiate Kumar's assertions of non-affiliation.

Finally, Kumar argues that Commerce only considered the lack of a single audited financial statement rather than the record as a whole. See Pl.'s Br. at 12. However, Commerce did not ask for an audited financial statement, or any one specific document. Instead, Commerce suggested that it would accept any supporting documentation, so long as it amounted to more than an unsubstantiated claim of non-affiliation. See Gov't Br. at 13; Second Suppl. Questionnaire at 4. Further, Commerce did not consider the lack of an audited financial statement alone; it considered all the documents Kumar provided to determine that Kumar failed to provide verifiable information regarding its affiliation with Companies A and B. See IDM at 12–13 (considering responses to all three questionnaires including supporting documentation). Commerce thus considered the record as a whole to conclude, based on substantial evidence, that necessary information was missing from the record and that Kumar withheld requested information, failed to provide information by the deadlines, and significantly impeded the administrative review proceeding. See 19 U.S.C. § 1677e(a). In sum, Commerce's use of facts otherwise available is supported by substantial evidence and in accordance with law.

> ### B. Commerce's Decision to Apply an Adverse Inference Is Supported by Substantial Evidence and in Accordance with Law.

In addition to determining that necessary information was missing from the record, Commerce found that Kumar did not act to the best of its ability in responding to questions about its affiliation. See IDM at 14–18. As a result, Commerce applied an inference that is adverse to Kumar in selecting from among the facts otherwise available. See id. at 22; 19 U.S.C. § 1677e(b).

Kumar argues that Commerce erred in determining that it did not act to the best of its ability in responding to Commerce's questions about affiliation and therefore that Commerce's application of an adverse inference is not supported by substantial evidence.  See Pl.'s Br. at 20–22.  According to Kumar, its responses amount to more than unsubstantiated statements and thus fully responded to Commerce's questionnaires.  See Pl.'s Reply at 4–5.  Kumar also maintains that it did not possess the necessary documents to satisfy Commerce's requests and did not have the power to force Companies A and B to provide the requisite information.  See Pl.'s Br. at 21.  The Government counters that Kumar failed to provide documentary support to establish that it was not affiliated with Companies A and B and thus failed to act to the best of its ability.  See Gov't Br. at 14.  The Government also argues that Kumar's failure to maintain adequate records is sufficient on its own to find that Kumar did not act to the best of its ability.  See id. at 15–16; Def's OAQ Resp. at 10.

Recall that Commerce may use an adverse inference "in selecting from among the facts otherwise available" when "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information."  19 U.S.C. § 1677e(b)(1)(A).  The "best of its ability" standard requires respondent to "put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation."  Nippon Steel, 337 F.3d at 1382.  "While the [best of its ability] standard does not require perfection and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record keeping."  Id.  "An adverse inference may not be drawn merely from a failure to respond, but only under circumstances in which it is reasonable for Commerce to expect that more forthcoming responses should have been made . . . ."  Nippon Steel, 337 F.3d at 1383.  "[A]n adverse inference may be appropriate where an interested party has been notified of a defect in its questionnaire

response yet continues to provide a defective response." Hyundai Elec. & Energy Sys. Co. v. United States, 15 F.4th 1078, 1090 (Fed. Cir. 2021) (upholding Commerce's decision to apply an adverse inference where Hyundai did not provide the "requested level of detail"); see also Maverick Tube Corp. v. United States, 857 F.3d 1353, 1361 (Fed. Cir. 2017) (upholding Commerce's decision to use an adverse inference in selecting among facts otherwise available where a respondent "had already failed to provide the information requested in Commerce's original questionnaire, and the supplemental questionnaire notified [the respondent] of that defect").

As outlined above, Commerce requested information about Kumar's affiliation three times and asked about Kumar's affiliation specifically with Companies A and B twice. See Initial Questionnaire at A-3; First Suppl. Questionnaire at 5; Second Suppl. Questionnaire at 4. Commerce specified in its Second Supplemental Questionnaire that it sought "supporting documents that substantiate [the] narrative explanation," and that "[s]upporting documents must contain more substantive information than just a statement saying that Kumar is not affiliated with these companies . . . ." Second Suppl. Questionnaire at 4. Kumar thus had three opportunities to provide a sufficient response and instead consistently made unsubstantiated claims that it was not affiliated with Companies A and B. See Initial Questionnaire Resp. at 7; First Suppl. Questionnaire Resp. at 6; Second Suppl. Questionnaire Resp. at 2–3. Kumar's responses amounted to persistent refusal to provide the information Commerce requested.

Kumar suggests that it could not provide documentation it did not possess. See Pl.'s Br. at 20; Pl.'s OAQ Resp. at 4. However, as the Government notes, see Gov't Br. at 15 (citing IDM at 16), Kumar's failure to adequately maintain records is a failure to act to the best of its ability. See Nippon Steel, 337 F.3d at 1382; Xi'an Metals & Mins. Imp. & Exp. Co. v. United States, 50 F.4th

98, 108 (Fed. Cir. 2022) (substantial evidence supports the determination that importer "fail[ed] to act to the best of its ability" when it "failed to . . . maintain adequate records . . . ." (alterations and citations omitted)).  Kumar was aware that records about its affiliation with Companies A and B were necessary for administrative reviews of antidumping orders based on Commerce's application of adverse inferences in prior administrative reviews.  In <u>Xi'an Metals</u>, the Federal Circuit noted that Commerce's requests for certain data "should not have come as a surprise" given that Commerce announced during a prior administrative review that it intended to require that data.  50 F.4th at 108.  Similarly, in this case Commerce previously found that Kumar failed to support its claim of non-affiliation with Companies A and B, and subsequently applied an adverse inference.  <u>See</u> 2018–20 IDM at 28–30; 2020–21 IDM at 5–6.  Commerce's requests for information regarding Kumar's affiliation with Companies A and B, therefore, should not have come as a surprise.  Kumar should reasonably have maintained records regarding its affiliation with Companies A and B based on prior administrative reviews.  This failure to maintain records that Kumar could have reasonably expected would be the subject of Commerce's inquiry is a sufficient basis for Commerce's determination that Kumar did not act to the best of its ability during the administrative review.  <u>See</u> <u>Nippon Steel</u>, 337 F.3d at 1382; <u>Xi'an Metals</u>, 50 F.4th at 108.  Therefore, Commerce's decision to apply an adverse inference is supported by substantial evidence and in accordance with law.

Finally, Kumar argues that the supplemental questionnaires did not provide enough detail to enable Kumar to respond, and that Commerce should have specified which documents to provide.  <u>See</u> Pl.'s Reply at 3; Pl.'s OAQ Resp. at 3.  However, Commerce asked specifically about Kumar's affiliation with Companies A and B and stated that any supporting documentation would suffice so long as it "contain[ed] more substantive information than just a statement saying that

Kumar is not affiliated with these companies . . . ."  Second Suppl. Questionnaire at 4.  Kumar

provided no supporting documentation containing substantive information beyond a statement of

non-affiliation.  See Initial Questionnaire Resp.; First Suppl. Questionnaire Resp.; Second Suppl.

Questionnaire Resp.  As the Government notes, see Gov't OAQ Resp. at 3, Kumar could have at

least offered the same type of documentation it provided during prior administrative reviews such

as tax returns or retirement deeds.  See, e.g., 2018–20 Second Suppl. Questionnaire Resp. at Exs.

A-18, A-18(a); 2018–20 Third Suppl. Questionnaire Resp. at 3.  Kumar notes that the documents

it used in previous administrative reviews had been found to be insufficient to prove non-

affiliation, arguing that "there was [therefore] no reason for Kumar to supply such documents."

Pl.'s Reply at 4.  However, Commerce did not find the documents in prior administrative reviews

to be inherently insufficient.  Instead, Commerce found that information within the documents

contradicted Kumar's claims of non-affiliation.  See 2018–20 Third Suppl. Questionnaire Resp. at

1–2 and Ex. A-21.1 (tax returns of a partner showing income from Companies A and B); 2020–21

Initial Questionnaire Resp. at Exs. A-4(c), (d) (copies of retirement deeds signed by individual

who had died before date of retirement).  Commerce's requests for information indicated that any

supporting documentation would have sufficed so long as it supported Kumar's claim of

non-affiliation and went beyond a mere statement of non-affiliation.

     Additionally, "[t]he burden of creating an adequate record lies with respondents and not

with Commerce."  NTN Bearing Corp. of Am. v. United States, 997 F.2d 1453, 1458 (Fed Cir.

1993) (quoting Tianjin Mach. Imp. & Exp. Corp. v. United States, 16 CIT 931, 936, 806 F. Supp. 2d

1008, 1015 (1992)); see also QVD Food, 658 F.3d at 1324.  This reflects that "[t]he burden of

production should belong to the party in possession of the necessary information."  Zenith Elecs.

Corp. v. United States, 988 F.2d 1573, 1583 (Fed. Cir. 1993); NTN Bearing, 997 F.2d at 1458.

Thus, Kumar bore the burden to support its assertion regarding non-affiliation. Commerce's general request for supporting documentation provided sufficient detail to afford notice given that Commerce was not privy to Kumar's records and did not know what information Kumar might have to support its assertion.

**II.    *Commerce Provided Sufficient Notice of the Deficiency and Provided Kumar an Opportunity to Remedy or Explain the Deficiency.***

Kumar argues that Commerce did not provide adequate notice that the information Kumar offered was deficient and did not provide an opportunity to remedy that deficiency. See Pl.'s Br. at 19. Kumar notes that its last filing was on February 15, 2023, 135 days before Commerce issued its preliminary determination. See id. at 18; Second Suppl. Questionnaire Resp. (filed on Feb. 15, 2023); Mem. from Y. Chun to B. Davis, re: Preliminary Application of Adverse Facts Available to Kumar Industries (Dep't Com. June 29, 2023), P.R. 181. Kumar also notes that Commerce issued supplemental questionnaires to Avid—the other mandatory respondent—through July 26, 2023. See Pl.'s Br. at 18. Thus, according to Kumar, Commerce failed to provide notice that Kumar's responses were inadequate or an opportunity to remedy its responses. See id. at 19. The Government counters that Commerce issued two supplemental questionnaires that both explained the deficiency with Kumar's responses and indicated how Kumar could remedy the problem. See Gov't Br. at 16. Additionally, the Government argues, Commerce reminded Kumar of the consequences of a lack of cooperation. See id. at 17 (citing Second Suppl. Questionnaire at 4).

Recall that where a submission is deficient, Commerce must "promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency." 19 U.S.C. § 1677m(d); see also Canadian Solar Inc. v. United States, 45 CIT __, __, 537 F. Supp. 3d 1380, 1398 (2021) (holding that "Commerce must give Canadian Solar an opportunity to correct any deficient

information."); <u>Shelter Forest Int'l Acquisition, Inc. v. United States</u>, 45 CIT __, __, 497 F. Supp.

3d 1388, 1401 (2021) ("Commerce must raise identified deficiencies . . . and provide respondents

with an opportunity to explain, correct[,] or supplement it.").  Where the person submitting the

response provides further information in response to a deficiency and Commerce "finds that such

response is not satisfactory," Commerce may also "disregard all or part of the original and

subsequent responses."  19 U.S.C. § 1677m(d).

      Recall that Commerce asked Kumar about its affiliation three times, explained twice that

its previous responses were deficient, and detailed how Kumar could remedy the deficiencies.  <u>See</u>

Initial Questionnaire at A-3; First Suppl. Questionnaire at 5; Second Suppl. Questionnaire at 4.  In

its Second Supplemental Questionnaire, Commerce noted that Kumar did not provide any

documents supporting its assertion of non-affiliation and explicitly requested support containing

more than unsubstantiated statements of non-affiliation.  <u>See</u> Second Suppl. Questionnaire at 4.

Kumar was aware of the consequences of non-cooperation based on the prior administrative

reviews, where Commerce applied adverse inferences based on information contradicting Kumar's

claims of non-affiliation.  <u>See</u> 2018–20 IDM at 28–32; 2020–21 IDM at 5–6.  Commerce stressed

to Kumar that "[i]n the previous administrative reviews, [it was] unable to determine Kumar's

affiliation status with these companies because Kumar failed to cooperate to the best of its ability

in response to [Commerce's] multiple requests for information . . . [and] [a]s a result," Commerce

used an adverse inference in selecting among facts otherwise available.    Second Suppl.

Questionnaire at 4.

      Kumar suggests that Commerce should have done more, stating that "[t]o the extent that

there were any deficiencies, they were the result of insufficient questions from the Department."

Pl.'s Reply at 5.  However, as the Government notes, <u>see</u> Gov't Br. at 18, Commerce does not have

an obligation to provide never-ending questionnaires, see Maverick Tube Corp. v. United States, 857 F.3d 1353, 1361 (Fed. Cir. 2017) (finding that "§ 1677m(d) does not require more" than notice in a supplemental questionnaire); NSK Ltd. v. United States, 481 F.3d 1355, 1360 n.1 (Fed. Cir. 2007) (same).  Here, Commerce notified Kumar of the deficiency and provided it an opportunity to remedy or explain the deficiency by indicating that Kumar's responses were not sufficient, stating that supporting documentation would remedy the deficiency, and even notifying Kumar of the consequences of non-compliance.  See First Suppl. Questionnaire at 5; Second Suppl. Questionnaire at 4.  Therefore, Commerce met its obligations to provide notice and an opportunity for remedy under 19 U.S.C. § 1677m(d).

Kumar correctly notes that "antidumping law is not intended to be applied in a punitive manner."  Pl.'s Br. at 10.  Indeed, "[t]he purpose of the adverse [inference] statute is to provide respondents with an incentive to cooperate with Commerce's investigation, not to impose punitive damages."  Essar Steel Ltd. v. United States, 678 F.3d 1268, 1276 (Fed. Cir. 2012) (internal quotation marks and citation omitted).  However, "[a] decision based on [an] adverse [inference] is not punitive when determined in accordance with the statutory requirements."  Id.  Again, Commerce explicitly asked about Kumar's affiliation with Companies A and B twice, notified Kumar of the deficiency in two supplemental questionnaires, and provided multiple opportunities for remedy.  See First Suppl. Questionnaire at 5; Second Suppl. Questionnaire at 4.  Commerce's decision to use an adverse inference is in accordance with the statutory requirements, and thus is not punitive.[7]

---

[7] While the use of an adverse inference "can be inappropriate if it is overly punitive," for example where Commerce imposes an unreasonably high antidumping margin, Essar Steel, 678 F.3d at 1276, Kumar does not argue that Commerce's use of an adverse inference in selecting among facts otherwise available is unreasonably high or punitive.  Kumar argues only that Commerce should not have used an adverse inference in selecting among facts otherwise available to calculate Kumar's rate in the first place.  See Pl.'s Br. at 2–4.

### III.    *Commerce's Decision to Subtract Antidumping and Countervailing Duties from Kumar's U.S. Duties Was Supported by Substantial Evidence and in Accordance with Law.*

Recall that the weighted average dumping margin is equal to the difference between the normal value, reflecting the price of the product in the home market, and the export price (or constructed export price), reflecting the sale price of the product in the United States.  <u>See</u> 19 U.S.C. § 1673.  When calculating this weighted average dumping margin, Commerce must reduce the export price by "the amount, if any, included in such price, attributable to . . . United States import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States."  <u>Id.</u> § 1677a(c)(2)(A).[8]  "United States import duties," generally do not include antidumping and countervailing duties.  <u>See</u> <u>Wheatland Tube Co. v. United States</u>, 495 F.3d 1355, 1361 (2007) (favorably quoting Commerce's position that it "consistently has treated AD duties as special duties not subject to the requirement to deduct 'United States import duties' (normal customs duties) from U.S. prices in calculating dumping margins." (citation omitted)).

According to Kumar, the amount it reported as U.S. duties included antidumping and countervailing duties for every transaction.  <u>See</u> Kumar's Case Br. at 44–46; <u>see also</u> Pl.'s Br. at 23–24.  Thus, Kumar asked Commerce to remove the antidumping and countervailing duties from

---

[8] Kumar cited to 19 C.F.R. § 351.402(f)(1)(i) instead of 19 U.S.C. § 1677a(c)(2)(A) on multiple occasions.  <u>See, e.g.</u>, Pl.'s Br. at 22–23; Letter from D. Craven to G. Raimondo, re: Case Br. at 42 (Aug. 14, 2023), P.R. 195 ("Kumar's Case Br.").  Section 351.402(f)(1)(i) states that Commerce, in calculating the export price, "will deduct the amount of any antidumping duty or countervailing duty which the exporter or producer . . . paid directly on behalf of the importer" or "reimbursed to the importer."  Kumar does not indicate that an exporter or producer paid the amount of antidumping or countervailing duties on behalf of the importer here and does not suggest that an exporter or producer reimbursed the importer for such amounts.  The Government correctly notes that Commerce's calculation of the export price and reduction by the amount U.S. duties here is governed instead by 19 U.S.C. § 1677a(C)(2)(A).  This seeming mistake does not affect the analysis here.

its reported U.S. duties for every transaction before reducing the export price by the amount of

U.S. duties as required by 19 U.S.C. § 1677a(c)(2)(A). See id. Kumar argues that Commerce's

calculation of Kumar's rate was "contrary to established Department precedent and was an abuse

of discretion," and presumptively that Commerce's calculation was not supported by substantial

evidence and in accordance with law.[9]  See Pl.'s Br. at 24. According to Kumar, Commerce

"improperly deducted [antidumping and countervailing] duties from the U.S. price," because it

removed the antidumping and countervailing duties from the U.S. duties for only three

transactions. Id. at 22. Kumar maintains that it provided details and "a sample calculation"

demonstrating that the U.S. duties included antidumping and countervailing duties for every

transaction. See id. at 24. The Government counters that Commerce appropriately removed the

amount of antidumping and countervailing duties from the amount of U.S. duties for only three

transactions because "Kumar provided documentation supporting its assertion that the amount of

U.S. duties it reported included antidumping and countervailing duties," for only these three

transactions. Gov't Br. at 19 (citing IDM at 22).

Because Kumar provided supporting documentation and a sample calculation

demonstrating it included antidumping and countervailing duties in the amount of U.S. duties for

only three transactions, see Kumar's Case Br. at 44–46, Commerce's decision to remove the

antidumping and countervailing duties from only these transactions was supported by substantial

evidence and in accordance with law. Commerce appropriately decided not to subtract the duties

---

[9] According to the applicable standard of review, as noted above, the court will uphold Commerce's
determination unless it is "unsupported by substantial evidence on the record, or otherwise not in
accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). "While certain appeals from antidumping
duty proceedings follow the 'arbitrary, capricious, abuse of discretion' standard, this appeal
reviews a final determination by Commerce under 19 U.S.C. § 1675 other than a determination
reviewable under 19 U.S.C. § 1516a(a)(1)." Ta Chen Stainless Steel Pipe, Inc. v. United States,
298 F.3d 1330, 1335 (Fed Cir. 2002) (citing 19 U.S.C. § 1516a(a)(2)(B)(iii)). Thus, the court
reviews Commerce's decision under the substantial evidence standard of section 1516a(b)(1)(A).

for any of the other transactions because Kumar provided no support for the suggestion that the U.S. duties for these other transactions included antidumping and countervailing duties.  Id.  In fact, as the Government notes, "the amount of the antidumping and countervailing duties that Kumar alleged is included in the amount of U.S. duties exceeds the total amount of U.S. duties it reported."  Gov't Br. at 19–20; see also Kumar's Case Br. at 44–46; Mem. from Y.J. Chun to B. Davis, re: Final Application of Adverse Facts Available to Kumar Industries at 2 (Dep't Com. Nov. 6, 2023) P.R. 209, C.R. 149 ("Final AFA Mem.") (listing U.S. duty rate, antidumping and countervailing duty rate Kumar requested be removed, and the difference for each of these transactions).  As Commerce noted in its Final AFA Memorandum, removing the antidumping and countervailing duties for these transactions would result in a nonsensical negative U.S. duties amount.  See Final AFA Mem. at 2.  Thus, Commerce reasonably determined that there was not sufficient evidence on the record that the U.S. duties for the remaining transactions included antidumping and countervailing duties.

Kumar suggests that Commerce should have asked for further clarification, stating that "[w]hile it is unfortunate that the Department did not ask Kumar a question about the duty field, it is also clear that for multiple entries the duty field is overstated."  Pl.'s Reply at 6.  However, as noted above, see supra Section I.B, it is the respondent's burden to create an adequate record and provide supporting information for its claims.  See NTN Bearing, 997 F.2d at 1458–59 ("The burden of creating an adequate record lies with respondents and not with Commerce.").  Kumar provided support for only three transactions.  See Kumar's Case Br. at 44–46.  Commerce thus appropriately subtracted antidumping and countervailing duties from the U.S. duties for those three transactions where Kumar sufficiently demonstrated that the U.S. duties included antidumping and countervailing duties.  Therefore, Commerce's calculation of Kumar's rate was supported by

substantial evidence and in accordance with law.

## CONCLUSION

For the foregoing reasons, Commerce's <u>Final Results</u> of the 2021–22 administrative review of the antidumping order on imports of glycine from the People's Republic of China, India, and Japan are sustained.

**<u>SO ORDERED.</u>**

<u>/s/   Gary S. Katzmann</u>
Gary S. Katzmann, Judge

Dated: <u>April 23, 2025</u>
        New York, New York